(January 16, 1914.)

C. H. McLEAN, Respondent, v. HAYDEN CREEK MINING & MILLING COMPANY, a Corporation, Appellant.

[138 Pac. 331.]

CORPORATION—SUPERINTENDENT—COMPENSATION—EVIDENCE—VERDICT OF JURY—SUFFICIENCY OF EVIDENCE.

1. Where the by-laws of a corporation provide that the compensation of the officers of a corporation, including its superintendent, shall be fixed by the trustees or board of directors, and the trustees or board of directors fail to fix such salary, and the superintendent is an officer of the corporation and a member of the board of directors, and he fails or neglects to have the board fix his com-

pensation as superintendent, and presents no claim therefor for eight years, and where he is paid at the rate of four dollars per day for all work that he does for the corporation, *held* that he is not entitled under the evidence in this case to any further compensation.

2. *Held,* that the evidence is not sufficient to support the verdict.

APPEAL from the District Court of the Eighth Judicial District, in and for Kootenai County. Hon. R. N. Dunn, Judge.

Action to recover compensation as superintendent for conducting the business of a mining corporation. Judgment for plaintiff. *Reversed.*

E. N. Le Veine and Voorhees & Canfield, for Appellant.

Where parties make a contract providing that some person shall fix some term thereof, namely, the compensation, any action upon the contract is premature until it is shown that application had been made and refused for the completion of the contract according to its terms. (*Tolmie v. Dean,* 1 Wash. Ter. 46; *Butler v. Tucker,* 24 Wend. (N. Y.) 447; *Dustan v. McAndrew,* 44 N. Y. 72; *Palmer v. Clark,* 106 Mass. 373; *Keeble v. Black,* 4 Tex. 69; *Morrell v. Dixfield,* 30 Me. 157; *Nofsinger v. Ring,* 71 Mo. 149, 36 Am. Rep. 456; *O'Reilly v. Kerns,* 52 Pa. 214; *Chapman v. Ferguson,* 152 Mo. App. 84, 132 S. W. 284.)

The respondent was down to 1908 the owner of substantially the entire capital stock of the corporation. He performed the service for which he now claims compensation, without any expectation of profit except that which would come to him as a stockholder, from the success of the corporation; he claimed and was paid wages for his work when he actually worked, and there was money in the corporate treasury, and he never made known or entertained a thought of other remuneration. Upon this state of facts he cannot recover. (*McMullen v. Ritchie,* 64 Fed. 253; *Pew v. First Nat. Bank,* 130 Mass. 391; Cook on Corp., sec. 657; *Smith v. Putnam,* 61 N. H. 632; *Citizens' Nat. Bank v. Elliott,* 55 Iowa,

104, 39 Am. Rep. 167, 7 N. W. 470; *American Central Ry. Co. v. Miles,* 52 Ill. 174; *Illinois Linen Co. v. Hough,* 91 Ill. 630; *Grisinger v. Hubbard,* 21 Ida. 469, Ann. Cas. 1913E, 87, 122 Pac. 853; *Goldstone v. Rustemeyer,* 21 Ida. 703, 123 Pac. 635.)

The improper and prejudicial remarks of counsel for plaintiff were not counteracted by any instruction from the trial court with reference thereto. (*Goldstone v. Rustemeyer, supra; Petajaniemi v. Washington Water Power Co.,* 22 Ida. 20, 124 Pac. 783; *Powers v. Boise City,* 22 Ida. 286, 125 Pac. 194.)

McFarland & McFarland, for Respondent.

The vote or resolution of a corporation appointing an agent need not be recorded or entered on the minutes, but may be inferred from the acceptance of his services, or the corporation's permitting him to act as such. (*Alabama & T. R. R. Co. v. Kidd,* 29 Ala. 221; *Wood v. Wiley Construction Co.,* 56 Conn. 87, 13 Atl. 137.)

Where the directors of a corporation appoint one of their number to act as a ministerial officer of the corporation, he is *prima facie* entitled to reasonable compensation for his services as such officer. (*Bee v. San Francisco etc. R. Co.,* 46 Cal. 248; *First Nat. Bank v. Drake,* 29 Kan. 311, 44 Am. Rep. 646; *Ten Eyck v. Pontiac etc. R. R. Co.,* 74 Mich. 226, 16 Am. St. 633, 41 N. W. 905, 3 L. R. A. 378; *McDowall v. Sheehan,* 59 Hun, 618, 13 N. Y. Supp. 386.)

"An officer of a corporation can recover on an implied contract for services rendered the corporation, providing such services are outside of the scope of his duties as such officer." (*Santa Clara Min. Assn. v. Meredith,* 49 Md. 389, 33 Am. Rep. 264; *Sargent v. Sargent Granite Co.,* 3 Misc. Rep. 325, 23 N. Y. Supp. 886; *Corinne Mill, Canal & Stock Co. v. Toponce,* 152 U. S. 405, 14 Sup. Ct. 632, 38 L. ed. 493.)

Officers and directors of a corporation can collect a reasonable amount for their services when they are appointed to act as manager, superintendent, or in any other capacity. (*Bassett v. Fairchild,* 6 Cal. Unrep. 458, 61 Pac. 791; *Ruby Chief*

*Min. & Mill Co. v. Prentice,* 25 Colo. 4, 52 Pac. 210; *Kenner v. Whitelock,* 152 Ind. 635, 53 N. E. 232; *Brown v. Creston Ice Co.,* 113 Iowa, 615, 85 N. W. 750; *Louisville Building Assn. v. Hegan,* 20 Ky. Law Rep. 1629, 49 S. W. 796; *Taussig v. St. Louis etc. R. Co.,* 166 Mo. 28, 89 Am. St. 674, 65 S. W. 969; *Bagley v. Carthage etc. R. Co.,* 165 N. Y. 179, 58 N. E. 895; *Baines v. Coos Bay Co.,* 41 Or. 135, 68 Pac. 397; *Gumaer v. Cripple Creek etc. Min. Co.,* 40 Colo. 1, 122 Am. St. 1024, 90 Pac. 81, 13 Ann. Cas. 781; *Wagner v. Edison Electric Illuminating Co.,* 141 Mo. App. 51, 121 S. W. 329.)

"Where the board of directors are empowered to appoint an official, and the by-laws provide that they shall fix a reasonable compensation for that official, and they do appoint the official but fail to fix a reasonable compensation for his services, in the absence of a salary fixed by the board of directors the law raises an *assumpsit* on the part of the company to pay a reasonable compensation." (*Grundy v. Pine Hill Coal Co.,* 10 Ky. Law Rep. 833, 9 S. W. 414; *Missouri River R. Co. v. Richards,* 8 Kan. 101; *Rogers v. Hastings etc. Ry. Co.,* 22 Minn. 25; *Stewart v. St. Louis etc. R. Co.,* 41 Fed. 736; *Bassett v. Fairchild,* 132 Cal. 637, 64 Pac. 1082, 52 L. R. A. 611.)

SULLIVAN, J.—The plaintiff, who is respondent here, brought this action against the appellant corporation to recover the sum of $14,371 upon two separate causes of action. The first cause of action was to recover $11,900 alleged to be due respondent for services performed for the appellant, at its special instance and request, as superintendent and general manager of its mines, for a period of eight years, from October 1, 1904, to October 1, 1912; and it is alleged that said services were worth $150 per month and that no part thereof had been paid except the sum of $2,500. The second cause of action was for various sums of money alleged to have been paid out by the respondent on behalf of the appellant corporation. On the trial the second cause of action was withdrawn from the jury by the court.

The cause was tried and verdict was found and judgment thereon entered in favor of respondent for $3,500 on said first cause of action. This appeal is from the judgment and an order denying a new trial. Numerous errors are assigned, twenty-two in number.

It appears from the record that the respondent in 1904 was the owner of a one-third interest in four certain mining claims, known as the "Spokane," "M. & M.," "Mammoth" and "Homestake," situated in Kootenai county, Idaho, and had an option for the purchase of the other two-thirds interest in said mining claims, at the price of $8,000. On October 4, 1904, the respondent and one Fitzsimmons, residing in the state of Idaho, and three other persons living in the state of Iowa, formed the defendant corporation, and the respondent conveyed to it his one-third interest in said mining claims, and the other incorporators agreed to finance the corporation. The amount of capital stock of said corporation was $1,000,000 divided into 1,000,000 shares of the par value of one dollar each. McLean, the respondent, as appears from the articles of incorporation, subscribed for 500,000 of said shares, and the other four incorporators for 50,000 shares each. Said articles of incorporation provided for the election of officers of said corporation to consist of a president, vice-president and secretary, treasurer and superintendent. The ninth section of the by-laws provides as follows:

"The compensation of all officers of the company, including superintendent, shall be fixed by the trustees, and they shall hold their office during the pleasure of the board. The compensation of all other employees shall be fixed by the superintendent, unless otherwise ordered by the board of trustees."

At the first meeting of the board of trustees, one E. L. Fitzsimmons, a resident of the state of Iowa, was elected president; the respondent, McLean, vice-president; F. J. Bray, residing in Iowa, secretary; and G. L. Fitzsimmons, residing at Rathdrum, Idaho, treasurer. The respondent continued as vice-president of said corporation until 1906, when he was elected president of the corporation. At all times after the organization of the corporation, and down to the year 1906,

the president and secretary of the corporation .resided in the state of Iowa and were absent from Idaho, and the respondent McLean was in active and actual control of the corporation's property and business in Idaho. He continued to be president of the corporation until about July 15, 1911, when he became, and now is, vice-president of said corporation.

In the year 1908 the respondent brought an action against said Fitzsimmons, Bray and other stockholders for the cancelation of stock held by them in said corporation, and procured a decree of cancelation which canceled all of the stock held by them. The persons who held said stock, or a part of them, were directors of said corporation, and it does not appear in the record whether after the cancelation of their stock there was a meeting of said corporation to elect other directors in their place, nor does it show that any directors were ever elected or a meeting of the stockholders ever had, and it nowhere appears that the first board of directors ever fixed the salary of the superintendent. This would indicate, and the record shows, that after said decree of cancelation McLean held nearly if not all of the stock of said corporation and sought to induce others to join him therein.

After the decree was obtained canceling the stock of certain stockholders in 1908, respondent McLean entered into negotiations with Roderick McKinzie, now deceased, and W. A. McKinzie, who were the owners of the other two-thirds interest in said mining claims, and one C. L. McKinzie, for the further operation and development of said mining claims, and it was agreed that the respondent should cancel the option held by him on said two-thirds interest in said mining claims owned by the McKinzies and that they should convey said two-thirds interest to the corporation and furnish certain money for prospecting and development work on said claims in consideration of the issuance to the said McKinzies of certain shares of said capital stock. Said C. L. McKinzie had not been interested in said mining claims or in said corporation up to that time, 1908.

On the trial, C. L. and W. A. McKinzie testified that before making said agreement they asked the respondent if the cor-

poration then owed any indebtedness, to which the respondent replied that it did not.   The McKinzies also testified that they would not have conveyed their two-thirds interest in said claims to said corporation had they known that there was any indebtedness against it.

W. A. McKinzie testified as follows: "Q. I just want to know what he said and what was said to him and what did you reply.   A. McLean told us it was free from all and any debt. Q. Was that one of the considerations upon which you went into it?   A. That is the reason we went in.   We would not have went in unless it was free from any and all encumbrances.   Q. Did you tell him so at that time in that conversation?   A. Yes, sir.   Q. Was there any arrangement made at that time or agreement concerning future work by Mr. McLean on this prospect?   A. It was agreed that any work that he would do there he would get four dollars a day for the actual time he put in.   Q. Did he make any statement as to what the old company had been paying him?   A. He did, yes.   Q. What did he say they had been paying him? A. Four dollars a day for his actual time."

Two or three other witnesses testified substantially to the same state of facts.

C. L. McKinzie testified as follows: "Mr. McLean, as an inducement for me to go in, guaranteed that the company was free from all encumbrances, debts or judgments whatsoever. That is one of the conditions on which I agreed to go into the company. . . . . When we got down to the details of my going in after McLean had said there were no claims of debts against the company, I says, 'Now, as I am going to put up most of the money, what about wages?' ·I asked him what he got from the old company; he said they had paid him four dollars ·a day for such time as he had worked there.   I says, 'Will you go to work, when we get ready to operate, under the same conditions?' and it was agreed to by us that he would get four dollars a day. . . . . He said that was satisfactory and agreed to it that he would get four dollars a day for such days as he worked.   I was to furnish the money and he was

to go out and take charge of the mine as foreman at four dollars a day.''

Said agreement was not in writing.

McLean testified as follows: ''Q. Did you tell either of the McKinzies that there was no indebtedness against the property? A. I told them there was no outside indebtedness against the property. Q. Did you tell them there was no indebtedness against the company? A. No, sir. Q. Did you at any time tell either of them that there was no indebtedness against the property? A. No, sir, not that I remember of. I told them there was no outside indebtedness, outside of myself.''

But he did not tell them the amount he claimed. McLean admits that he told them there was no outside indebtedness against the ''property,'' but that he did not tell them there was no indebtedness against the ''company.'' This is clearly a quibble on the part of this respondent. He knew that the McKinzies wanted to know whether there was any indebtedness for which the corporation could be held. Is it reasonable to suppose that the McKinzies would have conveyed their two-thirds interest in said mining claims to this corporation with a large amount of indebtedness hanging over it? The record shows that they were careful business men and they testified that they would not have done so.

Mr. Guay also testified that McLean told him before he entered into the contract for the development of said claims that the corporation did not owe a dollar. Guay had entered into a contract for the development and purchase of said mines, or the controlling interest in the capital stock, and it is improbable that he would have entered into an agreement to expend a large amount of money in the development of said mining claims with a large debt against it. There were three witnesses who testified positively that the respondent told them that there was no indebtedness against the corporation, and respondent admits that he told them there was no indebtedness against the property, when as a matter of law such a claim against the corporation must be satisfied out of its property. It is clear from the testimony that the McKinzies would

not have advanced money or taken any part in the development of said mining claims nor conveyed to it their two-thirds interest, had they known that the respondent was claiming a large amount due him from said corporation. At that time the corporation only held title to one-third interest in said mining claims that the respondent had conveyed to it, and it seems almost incredible that the McKinzies would have conveyed to said corporation their two-thirds interest and thus make their interests liable for the payment of a large amount of indebtedness that had in no manner been created by them and which they were under no obligations to pay.

There was but very little machinery of any kind upon said mining claims, and the record fails to show that there was any necessity for a superintendent to care for or look after the property of said corporation when it was not in operation, and it is a well-known fact that superintendents are not employed in addition to foremen where the development of mining claims is carried on in a small way, as was done in this case, where they kept not more than from one to four men employed and that during only a very few months in each year.

All of these facts go to show that it was not the intention of said corporation to employ a superintendent at $150 a month for eight years, or for any length of time, requiring more money for the payment of his salary than the McKinzies asked for their two-thirds interest in said mining claims, to wit, $8,000.

It was under a contract of employment made by the board of directors in 1904 that McLean claims this compensation. In 1908 he procured a cancelation of the stock held by the three Iowa directors and they were thus deprived of their office as directors. Then he began negotiations with the McKinzies to get them interested in his corporation, and it is not claimed that after the McKinzies became interested in said corporation the board of directors employed him in any manner to act as superintendent for the corporation. His entire claim for compensation is based on an alleged contract with the directors made in 1904. There was virtually a reorganization of the company in 1908 brought about through

the efforts of McLean, and the McKinzies were induced by him to convey their two-thirds interest in said mining claims to said corporation and take stock therein upon the representation of McLean that there was no indebtedness against said corporation. The McKinzies continued to develop said mining claims to a limited extent from 1908 until July 15, 1911, and during said time McLean never presented his claim for services as superintendent to the said McKinzies or to the corporation, but did present his claim monthly for four dollars a day as foreman for every day that he worked upon the mines, which claims were paid by the McKinzies.

The McKinzies evidently had not made a success in the development of said mining claims or had not placed them upon a paying basis, and in July, 1911, said corporation entered into a contract for the development and sale of said mining claims to one Octave Guay, which contract was signed by McLean as president of the corporation. Under that contract Guay became president of the corporation and the respondent became vice-president, and Guay assumed active control of said corporation's business. The respondent worked for him for about three months, and following some personal difficulties between Guay and respondent, respondent was discharged and not permitted to work in said mines, whereupon he brought this action, claiming compensation by way of salary as superintendent of said corporation's mining claims from the 1st of October, 1904, until the 1st of October, 1912, claiming for such services $11,900.

During those eight years respondent had not presented his claim for services as superintendent to said corporation, neither to the former nor to the later directors, but did present many claims monthly for his work on said mines at the rate of four dollars per day, which were paid by the appellant corporation, while other miners were paid only three dollars and fifty cents per day.

The respondent testified as follows: "Q. Did you ever mention to anybody connected with this corporation, to the McKinzies or either of them, or to Mr. Guay or anybody else, the fact of your claiming compensation as superintendent

prior to the time you commenced this action? A. Yes, I think I told W. A. McKinzie one day when we were talking about it, after things got straightened out to go right I expected to claim $5.00 there for work. Q. You told him that when? A. About a year ago. Q. Since you and Guay had some difficulty, was it not—since you became dissatisfied with Guay? A. I don't know; I am not positive whether a year ago, or just about the time we were making the deal with Guay. Q. So that from the year 1904 until the year 1911 you never mentioned to anybody the fact that you were expecting to be compensated for your services as superintendent, never mentioned it to any of the trustees or parties connected with the corporation, did you? A. I don't think I had been talking to them—no. I don't think I had talked to them about any compensation at all. Q. Did not present any claim for compensation? A. Probably I didn't. Probably I would not to this day if everything had been done right by the company."·

The evidence of respondent, taken in connection with the fact that at the time the McKinzies consented to go into said corporation and convey to it their two-thirds interest in said mining claims in 1908, to the effect that there was no indebtedness against said corporation at that time, and that the respondent for eight years never presented any claim to said corporation for his services as superintendent, almost conclusively establishes the fact that this claim for compensation for services was an after-thought and deserves very·little consideration; and the further fact of the respondent's being president and vice-president of said corporation during all those eight years and presumed to be familiar with the by-laws of said· corporation which provide that compensation of the superintendent should be fixed by the trustees, and the further fact that he never requested the trustees to fix such salary, is significant, to say the least. The respondent also testified that the matter of fixing such salary had never been mentioned by him to the board from the time of his selection as superintendent until the time of this trial, and that no action thereon had been taken by the corporation. In such cases the rule of law is clear that where parties make a con-

tract providing that some persons shall fix some term thereof, namely, the compensation, any action upon such contract is premature until it is shown that the application had been made to have the compensation fixed, and such application had been refused. (*Chapman v. Ferguson*, 152 Mo. App. 84, 132 S. W. 284, and authorities there cited.)

Summing up the testimony of respondent as admitted on the trial, and viewing it in the most liberal aspect, it is to the effect that he was elected to the office of superintendent by the trustees or directors; that no salary for such office was fixed by said board; that under the by-laws the salary must be fixed by the board before it can become an obligation of the corporation; that no application was made by the respondent for the fixing of such salary; that the office of superintendent, under the articles of incorporation and by-laws, was exactly parallel with the offices of president and vice-president, and that the respondent had no expectation of collecting a salary as superintendent until after his trouble with Guay.

Upon that state of facts, the presumption clearly arises that this claim for services was an after-thought upon the part of respondent. The trial court permitted a recovery to be had upon the theory that *assumpsit* would lie because of the benefit received by the appellant from the services performed by the respondent, and gave instructions to the jury along that line and refused to give certain instructions requested by appellant claimed to be applicable thereto from the appellant's point of view.

The respondent does not claim that a new contract was entered into after the agreement for the working of said mines had been entered into between the McKinzies and himself in 1908, but relies on his employment or appointment as superintendent in 1904. He seeks to bind the McKinzies by a contract that they had no part in making and one that had no force and effect after the new contract was entered into for the working of said mining claims in 1908, and respondent offers no excuse whatever for not presenting his claim for such services for a period of eight years, but admits that he did not present any such claim and probably would not have

done so if he had not had trouble with Guay and been discharged by him as an employee. This cause of action is based on a contract alleged to have been entered into in 1904 and not on a contract entered into in 1908, the date when the McKinzies became interested in said corporation, and the appellants cannot be held liable upon a contract entered into in 1908, unless the court makes a contract for the parties, for the reason that no such contract was entered into in 1908, and the respondent does not rely upon a contract made in 1908, and does not claim that he was employed as superintendent at $150 a month, or at any other sum, after the McKinzies became interested in said corporation.

There is no evidence of any knowledge whatever on the part of the officers, other than himself, of respondent's rendition of any services as superintendent for the corporation, and the instructions to the jury would permit the jury to find that respondent was superintendent and had rendered services for the corporation and could collect upon a *quantum meruit* because he himself, as managing officer, knew that the services had been rendered by himself, and made no objection to himself, nor forbid himself from performing such services. He as president of the corporation would not likely forbid himself from performing services he desired to perform as superintendent.

In the dealings of an officer of a corporation with the corporation, the rule of *uberrima fides* is well established; that courts will look with suspicion on all dealings such as is shown in this case, between the president or superintendent of a corporation and the corporation. The respondent was until 1908 the owner of substantially the entire capital stock of the corporation, and was interested more than anyone else in the proper development of said mines, and for all of the actual services rendered said corporation he received a daily compensation of four dollars, and any other compensation that he was to receive was clearly out of profits which he expected would come to him as a stockholder in said corporation.

It was held in *McMullen v. Ritchie,* 64 Fed. 253, that when the president and director of a corporation for whom no salary

is provided renders services to advance the interests of a corporation, being a large owner of its stock which would be benefited by its prosperity, and there is no knowledge on the part of the corporation that he expected payment for such services, he cannot recover therefor.· (See, also, *Pew v. First National Bank,* 130 Mass. 391.)

It is contended that the verdict of the jury was obtained through passion and prejudice. We think that contention is well founded. The evidence clearly shows that the verdict was not based upon the evidence in the case.˙ Improper and prejudicial remarks made by counsel for the plaintiff undoubtedly had their effect on the jury. Counsel for appellant objected to certain testimony offered by plaintiff, and plaintiff's counsel said: "Why don't you stop objecting to questions and trying to prevent the jury from hearing the facts so that they can do the right thing?" And again: "You ought to pay this man for his hard work." Question by counsel for the respondent to a witness for the appellant: "Anything about that business that would make you hesitate to tell the jury that you are a banker?" This was objected to and the court said: "I think that is improper. That may be stricken out." Counsel for appellant: "I want to make a protest in regard to the conduct of this case by counsel. Since the jury has been called there has been a steady attempt to try this case and wrest a verdict from this jury, not upon the testimony in the case but by insinuations of counsel." The court: "I don't think it necessary to discuss that. The jury are not going to render a verdict on insinuations of anybody. I will instruct the jury relative to remarks of counsel. Mr. Gray, don't make those remarks."

It is a little remarkable that an attorney of high professional reputation would indulge in such irrelevant and prejudicial remarks during the trial of a case, evidently for the purpose of arousing the passions of the jury against the appellant corporation. Those remarks were certainly made for the purpose of prejudicing the jury and nothing else, and it is surprising to this court that the trial judge would permit such remarks to be made, and when the transgression is so

flagrant, that he would not then and there reprimand counsel and punish him for contempt of court. It is very unpleasant to opposing counsel to have an attorney make such irrelevant and prejudicial remarks and statements before the jury for the purpose of prejudicing their minds in the case, and such conduct ought not to be tolerated for a moment. This court has had occasion heretofore to comment upon the misconduct of counsel in making remarks for the purpose of prejudicing the jury in favor of his client. (See *Goldstone v. Rustemeyer*, 21 Ida. 703, 123 Pac. 635; *Petajaniemi v. Washington Water Power Co.,* 22 Ida. 20, 124 Pac. 783; *Powers v. Boise City,* 22 Ida. 286, 125 Pac. 194.) In the case at bar, the court failed to give the jury any instruction relative to this improper conduct on the part of counsel for respondent, after stating during the trial of the case that he would do so; and even if the court had given such instruction, the virus of prejudice and passion was no doubt left in the minds of the jury by such remarks. An instruction by the court would not have eradicated it. Trial judges ought not to permit such disreputable practice, and when it is called to the attention of this court, it will not be tolerated. Attorneys must govern themselves accordingly.

Certain instructions given by the court are assigned as error, but we do not deem it necessary to pass upon those instructions for the reason that the evidence of the respondent is not sufficient to establish the plaintiff's right to recover in any sum whatever in this action.

The judgment must therefore be reversed and the cause remanded for further proceedings in accordance with the views expressed in this opinion. Costs awarded to appellant.

Stewart, J., concurs.

AILSHIE, C. J., Dissenting in Part and Concurring in Part.—I cannot agree with the conclusion reached by Mr. Justice Sullivan that the evidence is insufficient to support the verdict in this case. I think there is sufficient evidence in this record to go to the jury and to be considered by them for the

purpose at least of establishing the plaintiff's claim for compensation for services rendered subsequent to the transaction of 1908 when the McKinzies deeded their two-thirds interest in these mining claims to the corporation and took stock therefor. It is possible, and I think probable, that the appellant is estopped and precluded from claiming compensation from the corporation for services rendered prior to this transaction. The facts disclosed by the record would seem to be sufficient to estop the plaintiff from now claiming that he had a charge against the corporation prior to that time. On the other hand, I see no legal justification for this court's saying that the evidence is wholly insufficient to support a verdict for services rendered subsequent to that transaction. It is an established fact that the corporation did employ McLean as superintendent, and it is also an established fact that the question of compensation was then discussed and the fixing of the amount of compensation was left to be determined at a later date. The fact that the officers of the corporation did not make an order fixing the salary will certainly not relieve the corporation from liability or preclude the superintendent from receiving a reasonable compensation for services rendered under such employment. It is not to be supposed for a moment, I take it, that this man spent four years living out there on that mine, undergoing the privations and hardships attendant on such a life, with the expectation of donating his services to the corporation, or that the officers of the corporation believed he was giving them four years of his time living that isolated life. The fact that he did draw pay for the time he actually worked in the mine is not sufficient to preclude his right to recover a reasonable compensation for his time as superintendent and manager of the company's property and business.

I readily agree that some of the facts recited by Mr. Justice Sullivan constitute circumstances against the respondent, but these were matters of fact to be weighed by the jury and not by this court. The fact that a man has not presented a bill to his employer for four or eight years is a circumstance to be considered against the validity of his claim, but it certainly

is not conclusive against him nor does it furnish a decisive test for denying his claim when he comes into a court of justice seeking to recover his compensation. It is contrary to the ordinary course of business for a man to let his claim for labor run so long without demanding payment. Most people need their pay sooner. But it would be a dangerous and unusual precedent to establish to say that because a man has not presented his claim for four or eight years is a circumstance sufficient to bar his right of recovery. The legislature has by enacting the statute of limitations fixed the period which it intended should bar the right of recovery in actions for debt and this court has no right to add any new grounds of limitations.

Now, I agree that the judgment in this case ought to be reversed, but I base that conclusion upon the conduct of counsel for respondent in the trial court. This court has certainly expressed itself so frequently on the matter of improper and prejudicial statements and assertions by counsel in the trial of cases before juries that there ought to be no mistaking the position and attitude of the court on these matters. Lawsuits ought to be conducted before courts and juries for the purpose of arriving at just conclusions based upon the evidence and the law applicable thereto. They ought not to be determined upon prejudice and passion, and the courts ought not to be the scenes of personal bickerings and sparring and jangling between counsel. The judges of the courts ought to be more than referees in this kind of a game. If one attorney indulges in erroneous remarks and prejudicial statements and in badgering the opposing counsel, the adverse counsel is left only one of two alternatives: First, to meekly submit and see his client defeated, or to join in the wrangle and turmoil. The sooner courts shut off this kind of procedure the better it will be for the administration of justice.

For the reasons last mentioned I agree to a reversal of the judgment, but I dissent from that part of the majority opinion which holds that the evidence is not sufficient "to establish the plaintiff's right to recover in any sum whatever." I think

such holding is contrary to the statute (sec. 4824, Rev. Codes) and the uniform holdings of this court. (*Buster v. Fletcher,* 22 Ida. 172, 125 Pac. 226; *Herculith Co. v. Gustafson,* 22 Ida. 537, 126 Pac. 1050, and many other cases.)