241 P.2d 1178

INEAS et al. v. UNION PAC. R. CO. et al.

No. 7757.

Supreme Court of Idaho.

March 12, 1952.

392

Ross B. Haddock, Shoshone, Parry, Keenan, Robertson & Daly, Twin Falls, Robert E. Smylie, Atty. Gen., and Glenn A. Coughlan, Asst. Atty. Gen., for appellants.

Bryan P. Leverich, Salt Lake City, Utah, L. H. Anderson, and E. H. Casterlin, Pocatello, for respondents.

GIVENS, Chief Justice.

In the Village of Shoshone, Greenwood Street, which is also U. S. Highway No. 93, extends northerly between 27° and 28° east of north and southerly at the same divergence. North Rail Street intersects Greenwood Street at right angles and thus extends westerly north 27° or 28° of west and similarly, east.

Respondent Company's six tracks lie between and parallel to North and South Rail Streets. The southernmost is a passing track, the center of which is 72 feet north of the center of the intersection of South Rail and Greenwood Streets. The center of the next track, which is the eastbound main line track, is 23 feet further north; thence to the center of the third or westbound main line track, is 22½ feet. Apparently from the center of the westbound main line track to the next line north, a passing track, is 15 feet. The two northernmost tracks, the first the beginning of a switching track, apparently are approximately 30 and 42½ feet north, respectively, of the fourth or passing track.

The shops of the State Highway Department are on South Rail Street approximately four blocks west of the intersection of South Rail and Greenwood Streets, as shown by Dfts. Ex. 2, which is drawn to the scale of 20 feet to the inch and thus shows that the north line of vehicular traffic on South Rail Street is 60 feet south of the south rail of respondent Company's southernmost passing track and apparently the north line of such Street is 105 feet south of the south rail of the westbound main line track.

Walnut Street is 360 feet west of and parallel to Greenwood Street. These are the two principal streets crossing respondent Company's railroad tracks in what might be termed the center of the business section of Shoshone. A fair portion, if not most, of the business houses are on the north side of North Rail Street or on the south side of South Rail Street. Dfts. Ex. 1, a panoramic picture, reproduced herewith, gives a clear and graphic view to the north over the crossing in question, and of signs, service poles and lay of the entire territory involved. Nine hundred fifty feet east of the crossing is respondent Company's coal chute, which clearly appears in the right-hand portion of this panoramic picture.

continued below continued below

continued from above

continued from above

PLAT
No. 1

March 27, 1946, Manuel Ineas, employed as a laborer in the Bureau of Highways under the Department of Public Works of the State, as a passenger in a State truck driven by Ottis H. Webb, a carpenter and co-employee, left the shops of the State Highway Department and drove east on South Rail Street, pulling up to and stopping at the stop sign on South Rail Street on the west side of Highway No. 93, or Greenwood Street, then turned slowly to the left or north and proceeded north on Greenwood Street at a speed variously estimated as between three and five miles per hour, or about as fast as a man could walk. Respondent Company's westbound passenger train, traveling at a speed estimated by various witnesses to be from 30 to 55 miles per hour, struck the truck at the intersection of Greenwood Street with the westbound main line track, hurling the truck into the air, widely scattering portions of the truck, throwing the occupants out and killing them, and carrying on the front of the engine to where it stopped, the right-hand door of the truck which contained a canvas completely covering the window part of the door in the place of glass. The engine stopped 1,704 feet west of the crossing. The picture of the inside of this door, taken immediately after the accident (Dfts. Ex. 8) and reproduced herewith, shows the canvas extending clear across the upper or open or window part of the door.

PLAT No. 2

Ineas' widow, and as guardian of three minor children, and Walter C. Musgrave, Manager of the State Insurance Fund of the State of Idaho, the insurance carrier for the Bureau of Public Highways in the Department of Public Works, subrogated to other plaintiffs under Section 72–204 I.C., sued for the death of Ineas, alleging as respondents' acts of negligence: excessive speed of the train, failure to sound a whistle or ring a bell as required by statute, failure of the train crew to watch or maintain a look-out in time to slow said train, or adequately warn users of the crossing of the approach of the train; failure to stop or reduce the speed of the train; failure to provide a watchman or mechanical signal or device at the crossing, and failure to provide an underpass or overpass.

The jury returned a verdict in favor of respondents.

Appellants assign as error striking certain paragraphs of the amended complaint, rulings on evidence, alleged prejudicial remarks of counsel for respondents, and certain instructions given and refused.

At the conclusion of the case, respondents made a motion for a non-suit on the grounds the evidence showed the respondents had in no particular been negligent and that: "The decedent was guilty of contributory negligence as a matter of law. He knew he was approaching a railroad track on which trains operated. He knew, or by law was charged with knowing, he had to look and listen for the train, which was in plain view at any time when the truck he was in was at least 100 feet from the tracks that the train was upon and which could have been heard, had he listened, for the whistle of the train was being sounded. It is evident he neither looked nor listened, for if he had, he would have both seen and heard the train. He failed to warn or caution the driver to also look and listen, for if he had done that, the driver would have and could have stopped the truck before reaching the tracks. There were positive eye witnesses to the accident, hence no presumption of due care exists. The presumption was clearly destroyed by the negligent acts and conduct of the decedent. The decedent was negligent in not taking adequate means of looking for the train when the right front door of the truck was covered with canvas."

The motion was denied.

Section 49–546(a), I.C., is as follows: "It shall be unlawful for any person to drive any vehicle upon a highway with any sign, poster or other non-transparent material upon the front windshield, side wings, side or rear windows, of such motor vehicle other than a certificate or other paper authorized to be so displayed by authority of competent municipal state or federal officials."

Section 49–556 I.C., authorizes the Commissioner of Public Works to " * * * classify, designate and mark both intra-

state and interstate highways * * * and to provide a uniform system of marking and signing such highways * * *."

█ Section 49–558, I.C., prohibits other persons from erecting highway signs. The Idaho Motorist's Guide, issued January 15, 1946 by the Department of Law Enforcement, Boise, contains in connection with drawings of various highway signs, including an octagonal sign with the word Stop in the center thereof, this notation: "Traffic Signs: Traffic signs warn us of hazards which are not obvious, indicate where reduced speed is necessary, advise us of traffic regulations and guide us on the route we desire to follow: Therefore, it is very important that we are able to recognize quickly what a sign means. Traffic signs have been standardized as to shape, colors, and wording; signs which are most important at night have reflector buttons to indicate their shape and to show such warnings as Stop and R R for railroad crossing." p. 15.

We are authorized to take judicial notice of this pamphlet and its existence as an official pronouncement of an executive department of the State of Idaho by Section 9–101, I.C. There was, at the time of the accident and as appears upon Dfts.Ex. 1, an official highway Stop sign on the rail crossing sign on the right-hand side of Greenwood Street facing the south and immediately below it was the notation of the number of tracks, being 6.

Merritt, one of appellants' most favorable witnesses, testified he saw the truck approach and stop at the intersection of South Rail and Greenwood Streets and then turn slowly to the north. He did not watch it all the time from then until the collision. No witness except Decker watched the truck's continuous travel on Greenwood Street. Merritt also testified he, himself, was standing on the west side of Greenwood Street about 60 feet south of the southwest corner of Greenwood and South Rail Streets; his view of the track to the east was obscured by the building across, i. e., on the east side of the Street, but he saw the train when it was about half way from the coal chute to the crossing—about 475 feet from the collision point; and the truck at that time was about 40 feet from the point of collision going very slowly or about three miles per hour. He estimated the speed of the train at fifty miles per hour. At that speed, it would go approximately 74.1 feet per second and would take about 6.41 seconds to go from where he first saw it to the point of collision. The truck, at three miles per hour, would go 4.4 feet per second or in 6.41 seconds, it would travel 28.20 feet. At thirty miles per hour it would have taken the train 11.87 seconds to go half way between the coal chute to the crossing, and at three miles per hour the truck would have traveled approximately 52.22 feet.

Decker, the fireman on the engine, testified he saw the truck turning on to Green-

wood Street as the engine passed the coal chute; that he watched it continuously until immediately before the collision when the truck was obscured by the front part of the engine; that the truck did not stop after it made the turn on to Greenwood Street; that he first concluded the truck would not stop when the front wheels were on the rail of the eastbound track, i. e., approximately 17 feet south of the south rail of the westbound main line track, the rails being four feet eight inches apart. At that time the engine was 100 feet east of the point of collision, which distance at 30 miles per hour, could have been traversed in a little less than 2½ seconds. At 50 miles per hour, 1.34 seconds. In the two and a half seconds at four miles per hour, the truck would have traveled 14.65 feet and in 1½ seconds, it would have traveled about 7.84 feet.

Decker further testified that when he concluded the truck was not going to stop, he called to the engineer to apply the brakes, which was not done because the engineer did not understand, and it would have taken from two to three seconds for the engineer to have applied the brakes and then from four to five seconds, a total of six to eight seconds, or over twice the time at the slowest speed the train was estimated to be going in 2½ seconds, for the brakes to become effective; therefore, there was insufficient time, because Decker was not contradicted in this regard, after he realized the truck was not going to stop, to

have retarded the speed of the train sufficiently to avoid hitting the truck. There is no evidence to indicate it would have been otherwise apparent to anyone else on or off the train, until the truck was actually moving on to the rails of the westbound main line track. At, and prior thereto, the engine was clearly visible and in the neighborhood of 100 feet east of the crossing—ample opportunity for the truck to stop, but too late for anything to be done by the operators of the train to avoid the collision.

Numerous points of law are presented and argued by appellants and respondents, pro and con, and various features of the evidence construed and emphasized. The following propositions of law, considered seriatim and applied to the undisputed facts, are sufficient to resolve the case:

1. Conceding, as argued in part at least, by appellants, that Ineas as a passenger in the truck was not under the same or similar duty or obligation of care and watchfulness that the driver was, he, nevertheless, was charged with exercising reasonable care and caution for his own safety and this required him not to rely blindly upon the exercise of care and caution by the driver, but to take heed of all those facts and circumstances which were plainly visible to him and as much of a warning to him as to the driver, and in connection therewith, the driver's acts; Dale v. Jaeger, 44 Idaho 576 at page 581, 258 P. 1081; Rowe v. Northern Pac. Ry.

Co., 52 Idaho 649, 17 P.2d 352; 47 A.L.R. 295; Parker v. Southern Pac. Co., 204 Cal. 609, 269 P. 622; Christie v. Atchison, T. & S. F. Ry. Co., 154 Kan. 713, 121 P.2d 208 at page 210; Valles v. Union Pac. R. Co., Idaho, 238 P.2d 1154 at page 1158; Cate v. Fresno Traction Co., 213 Cal. 190, 2 P. 2d 364; Hooker v. Missouri Pac. R. Co., 134 Kan. 762, 8 P.2d 394; Blew v. Chicago, R. I. & P. Ry. Co., 177 Okl. 553, 61 P.2d 258; Humphrey v. Atchison, T. & S. F. Ry. Co., 50 Ariz. 167, 70 P.2d 319; Buchhein v. Atchison, T. & S. F. Ry. Co., 147 Kan. 192, 75 P.2d 280; Tice v. Pacific Electric Ry. Co., 36 Cal.App.2d 66, 96 P.2d 1022, 97 P.2d 844.

These facts are undisputed: first, the only positive testimony is that the truck did not, after turning into Greenwood Street, stop at the highway stop sign or stop at all until it was struck by the train. This was a positive violation of Section 49–506, I.C., and by Section 49–560, I.C., a misdemeanor, and as apparent to Ineas as to the driver of the truck. Second, the canvas on the window was not only a violation of the express statute, but obviously in itself constituted a menace and a hazard to the occupants of the truck, as apparent, if not more so, to Ineas than to Webb, because Ineas was sitting on the side next to the window and when the truck turned towards the north, the canvas completely obstructed the view through the window. We do not consider that Ineas was particeps criminis in the violation of these statutes, because he was not driving the truck, but since everyone is charged with a knowledge of the law, it is legitimate to consider the infractions of these statutes, palpably designed for the protection not only of the driver of a motor vehicle, but also the passengers and others, as bearing upon lack of due care and caution as a matter of law, by Ineas. Violation of these statutes constitutes negligence per se. Brixey v. Craig, 49 Idaho 319, 288 P. 152; Kirkley v. Portland Electric Power Co., 136 Or. 421, 298 P. 237; Strong v. Kittenger, 300 Mich. 126, 1 N.W.2d 479 at page 482; Paquette v. Consumers Power Co., 316 Mich. 501, 25 N.W.2d 599. Third, if the sun were shining in the faces of Webb and Ineas as the truck proceeded southeasterly along South Rail Street before it turned in a northeasterly direction as it proceeded on Greenwood Street, the position of the sun obviously was not negligence on the part of respondents and but added to the care and caution to be exercised by Ineas. 44 Am.Jur. p. 808, Par. 555. The train was plainly visible to anyone in the position that Ineas was from the time it passed the coal chute 950 feet east of the crossing, because witnesses for appellants in addition to Merritt, who—though not in exactly the same position as Ineas—were to the west and south and possibly one north of the tracks, had no better vision than Ineas should and could have had if the canvas had not obstructed his view (the presence of the canvas in the window was, of course, not chargeable to respondents)

and these witnesses, being appellants', testified they clearly saw the train, heard it whistle, *noted its speed* (and if they could, he Ineas could and should have) and that when they saw the train, the truck in which Ineas was a passenger was still in a position of safety, i. e., could have stopped quickly, and was continuously so from the time it turned on to Greenwood Street when the train was visible not only from the coal chute, but east of there, and until the truck came on to the lethal track.

The second proposition of law is that the operators of a train are under no duty to retard the speed of the train or stop it until there is something to indicate to them the traveler approaching the crossing is not going to stop before reaching a point of danger. McIntire v. Oregon Short Line R. R. Co., 56 Idaho 392 at page 397, 55 P.2d 148; Ross v. Fleming, 165 Kan. 279, 194 P.2d 491 at page 497; Buchhein v. Atchison, R. & S. F. Ry. Co., 147 Kan. 192, 75 P.2d 280 at page 282, supra. The testimony of Decker, the fireman, is uncontradicted that he saw the truck from the time the engine passed the coal chute and there was nothing to indicate to him the driver of the truck did not intend to stop until it was on the track immediately south of the lethal track, the engine then being about 100 feet east of the crossing. Appellants assign as error sustaining an objection and permitting an answer in connection with Decker's examination, but the full record shows full delineation and

that the question to which objection was sustained was, in effect, later answered:

"Q. And at that moment the truck was curving around on Greenwood Street and starting across? A. That is right.

"Q. Moving at a constant and steady speed? A. Yes.

"Q. And you watched it? A. I did.

"Q. Now, there was at some point along in there where you could have perhaps called the engineer's attention and slowed that train down a little bit so the truck could have come across?

"Mr. Anderson: Just a minute, if the Court please, I object to that. There isn't any such a duty under the decisions of the Idaho Supreme Court. The question is incompetent.

"The Court: Well, it is a question as to when he saw it, I suppose. I think I will let you develop that. I will try and cover that in my instructions.

"Mr. Anderson: If the Court please, I don't want to argue the point, but there is no duty upon the—

"Mr. Parry: I object to statements of law in front of the jury. If there are any legal questions to be argued—

"The Court: I think we understand the law of the situation.

"Mr. Parry: Yes, I am testing what he told Mr. Anderson on direct examination as to what he did and when he did it.

"Mr. Anderson: But he is trying to have this witness answer some sort of a question that is contrary to the law.

"Mr. Parry: That is absurd.

"The Court: On cross examination considerable leeway is allowed, gentlemen."

Whereupon the last question was read.

"A. I don't know what would determine that place.

"Q. But there would be such a place? A. No.

"Q. Well, as it was— A. Not in that distance.

"Q. Now, then, let me see if I can follow you up. You would say, then, there was nothing that could be done after you passed the coal chute that could have prevented that collision?

"Mr. Anderson: Just a minute, if the Court please. Definitely that is contrary to everything that we know about the law of crossing cases. There is no duty for a train to stop or slow up as an automobile is merely approaching. It is only when they get to a point where they might be in danger that they have to do anything, and he is trying to get this witness now to overrule the law for the benefit of himself and someone else, and that is why I am objecting, because there is no such duty imposed that he is trying to get this witness to testify about.

"Mr. Parry: I assign counsel's remark in front of the jury as error, Your Honor. Counsel knows better than to coach his witness and lecture on the law.

"Mr. Anderson: I am not coaching the witness.

"Mr. Parry: That is for no other purpose. This witness was brought upon the stand, and he brought out in detail on direct examination that from the time he hollered to the engineer, using his words, nothing could be done. I am certainly entitled to bring out the fact that if he hollered, using his words, sooner, something might have been done. That is no question of law. It is testing this gentleman's credibility in the method of operating trains and railroads.

"Mr. Anderson: There was no duty to perform before that.

"Mr. Parry: The Court will tell the jury what is the duty.

"The Court: It is a question of when this danger became apparent.

"Mr. Parry: That is the point I am asking. That is what I am leading up to.

"The Court: Well, let's bring that out. When it was apparent to him that the car was in danger, could he stop?

"Mr. Parry: Well, he said that once.

"The Court: All right, but let's not take time when it wasn't apparent. It has to be apparent.

"Mr. Parry: And I am bringing that out."

Whereupon the last question was read.

"The Court: Yes, I think I will sustain the objection to that question. Mr. Parry: I will reframe the question.

"Q. If I understand it, Mr. Decker, did you say when it became apparent to

you there was nothing that could be done? Is that what you want to testify— A. I am not saying that nothing could be done. The engineer done all in his possible resources he could do. May I go a little further?

"Q. Yes, go right ahead. A. Now, he did not go to emergency, because he had made two applications prior to that, and I think he had the thought of the passengers in mind.

"Mr. Parry: Now, just a moment. I object to a statement as to what the engineer might have had in his mind.

"The Court: Yes, as to his thoughts.

"Mr. Parry: Yes, that should be stricken.

"Q. Now, so we follow each other, at some given place over there you hollered at the engineer. We are not arguing about that, are we? .A. Huh uh.

.·"Q. And you now tell us that at that time, when you hollered, Mr. LeBailey did everything that you think he could do and should do and it had no effect upon the collision, is that correct? A. I would say that his action, after I issued my command, did not retard the speed of the train materially at that time until it hit the truck— from that time until it hit the truck.

"Q. And if you had become aware and issued your command shall we say a few seconds sooner, it would have been retarded more?

"Mr. Anderson: I submit it hasn't been developed that there was any need for such a command.

"Mr. Parry: I object to counsel's interruption of my cross examination.

"Mr. Anderson: I have a right to object, haven't I?

"A. Yes, had we sufficient distance to stop the train. I could have issued the warning way back at the other end of the passing track.

"Q. Well, you are trying to be absurd now. I don't think that is funny. I am not asking—

"Mr. Anderson: It is no more absurd than your questions.

"Mr. Parry: I object to counsel's comments and assign them as errors in the record.

"Q. What I say is if you issued your demands a few seconds prior to when you did, the train could have been slowed down more at the crossing, couldn't it? A. Yes.

"Q. Why, of course. As it was, there was a tie. The train and the truck got there at the same time, didn't they? A. We agree on that.

"Q. And if the train had been slowed down a bit, that truck would have cleared and there would be two gentlemen alive that aren't alive now. Isn't that correct? A. Yes, had he sufficient time to get over the crossing he would not have been killed, that is right.

"Mr. Parry: You may have your witness back.

"Mr. Anderson: Thank you for that.

"Mr. Parry: I thought you would appreciate it."

Redirect examination—By Mr. Anderson:

"Q. Mr. Decker, up until the time that you shouted to the engineer, was this truck in any danger?

"Mr. Parry: I object to that as calling for a conclusion and not being proper redirect.

"The Court: He may answer.

"A. No, he was not.

"Mr. Parry: I move it be—

"Q. Was he still a safe distance from the tracks your train was on at that time? A. Yes, he was.

"Mr. Parry: Just a moment. May I have that answer stricken for the purposes of an objection?

"The Court: For the purposes of objecting, yes.

"Mr. Parry: I object to that question as calling for a conclusion. What is a safe distance is a conclusion pure and simple. We have gone into the facts. That it wasn't a safe distance is evidenced by the fact that Mr. Ineas isn't here.

"The Court: The objection will be overruled. It may stand."

Likewise, remarks and arguments by respective counsel did not constitute error. Spencer v. Gedney, 45 Idaho 64 at page 65, 260 P. 699. The situation is palpably not comparable to that censured in McLean v. Hayden Creek Min., etc., Co., 25 Idaho 416 at page 429, 138 P. 331. Note Instruction No. 42. Furthermore, no adverse ruling appears to preserve the charge of error. Palcher v. Oregon Short Line R. R. Co., 31 Idaho 93 at page 100, 169 P. 298; Labonte v. Davidson, 31 Idaho 644 at page 652, 175 P. 588; Shaddy v. Daley, 58 Idaho 536 at page 540, 76 P.2d 279. In Cogswell v. C. C. Anderson Stores Co., 68 Idaho 205 at page 221, 192 P.2d 383, there was, in effect, an adverse ruling and no immediate admonitory instruction.

The third proposition of law is that the last clear chance cannot operate in favor of deceased unless there remains time after the defendant is reasonably charged with knowledge of deceased's peril for the defendant to prevent the injury. The uncontradicted mathematics of the relative speed of the truck and the train and what their converging positions were, show there was not time for the last clear chance to be applicable. Ross v. Fleming, supra, 165 Kan. 279, 194 P.2d 491 at page 497.

Appellants assign that it was error to strike this portion of Paragraph 5 of the Amended Complaint: "* * * and to the South of said train to determine if the train could proceed forward with safety and to advise and warn the engineer of said train of anything that he saw which

might be injured if said train went forward on said tracks." and the portion of Paragraph 12 of the Amended Complaint as follows: "* * * or to look ahead and to the south of said train to determine whether any travelers or other persons were about to use said crossing, and that the said C. H. Decker then failed to inform the engineer of said train of the approach to the crossing of the said truck in which Manuel Ineas was riding, and of the presence of said truck on said crossing in order that said train could be slowed or stopped, or the driver of said truck could be adequately warned of the approach of said train." If the assignment be well taken, no prejudice resulted because the extent and effect of Decker's watching was fully developed and as indicated elsewhere, the analysis shows there was no negligence as a matter of law on his part in connection with full consideration of these allegations of the amended complaint and his duty as asserted thereby.

 The fourth proposition of law is that if there is positive evidence which conclusively contradicts the presumption of due care and caution which applies to a person killed, and by thus showing the person has not exercised such due care and caution, it not only overcomes the presumption, but prevents recovery by the deceased's representatives. Burrow v. Idaho, etc., R. R. Co., 24 Idaho 652, 135 P. 838; Geist v. Moore, 58 Idaho 149 at page 166; 70 P.2d 403; Allan v. Oregon Short Line R. Co., 60 Idaho 267, 90 P.2d 707; Brown v. Graham, 62 Idaho 388, 112 P.2d 485; Missouri, K. & T. Ry. Co. v. Bussey, 66 Kan. 735, 71 P. 261; Colorado & S. Ry. Co. v. Thomas, 33 Colo. 517, 81 P. 801, 70 L.R. A. 681, 3 Ann.Cas. 700, 18 Am.Neg.Rep. 316; Richards v. Chicago, R. I. & P. Ry. Co., 157 Kan. 378, 139 P.2d 427; Johnson v. Union Pac. R. Co., 157 Kan. 633, 143 P.2d 630; Horton v. Atchison, T. & S. F. Ry. Co., 161 Kan. 403, 168 P.2d 928 at page 937; Grant v. Chicago, M. & St. P. Ry. Co., 78 Mont. 97, 252 P. 382; Lamp v. Pennsylvania R. Co., 305 Pa. 520, 158 A. 269, 84 A.L.R. 1217; Fidelity Trust Co. v. Pennsylvania R. Co., 326 Pa. 195, 191 A. 609 at page 610; Riess v. Pennsylvania R. Co., 2 Cir., 107 F.2d 385 at page 386; Ballmer v. Pennsylvania R. Co., 59 Ohio 221, 17 N.E.2d 435 at page 437. Appellants' own evidence shows the whistle was blown and the only criticism directed to that and the contention there was negligence in regard thereto, is the whistle was not blown as required by Section 62–412, I.C., 80 rods or 1320 feet, east of the crossing, i. e., east of the coal chute. The evidence discloses without dispute, however, that the train whistled three times between the coal chute and the crossing—a more impelling warning than if it had whistled further away, and these whistles were at a time and place when, if heeded by the occupants of the truck, would have prevented the accident and no negligence in this connection is chargeable to respondents. Knorp v.

Thompson, 357 Mo. 1062, 212 S.W.2d 584, 5 A.L.R.2d 103.

Appellants further urge that the Court erred in striking from the complaint allegations with regard to there being negligence on the part of respondents in not having a non-grade crossing and/or not having a watchman or flagman at the crossing. Conceding the evidence shows this was rather a heavily traveled crossing and that many trains cross it during the day and that failure to have a watchman or flagman or a non-grade crossing may constitute negligence and may be a question for the jury, nevertheless these assertions of negligence must be such as to constitute the proximate cause in connection with the particular circumstances of the accident involved. The uncontradicted facts as above disclosed show at the time of this accident there was no other traffic on the crossing; no other trains were in the vicinity, except the switching train north and east, near the freight depot; no evidence its whistle was blowing, bell ringing or anything in connection therewith tended to confuse or deflect the attention of the occupants of the truck; consequently, the assertions of negligence as to the nature and what should have been the nature of the crossing, in the absence of argument and authority, under the undisputed facts do not overcome the force and effect of

Ineas' contributory negligence; Byerley v. Northern Pac. Ry. Co., 11 Wash.2d 604, 120 P.2d 453, consisting of riding in the truck completely aware of two violations of express statutes, the canvass in the window, not stopping at the stop sign, and the further fact that the train was perfectly and clearly visible to him had he been exercising a modicum of the due care and caution which rested upon him as a passenger, without any imputation to him of the negligence of the driver. At the speed the truck was traveling, between three and at the most five miles per hour, Ineas could have gotten out of the truck at any time after the truck turned on to Greenwood Street, before it was hit.

It is therefore, apparent contributory negligence on the part of Ineas appears so conclusively that as a matter of law, his representatives may not recover. Allan v. Oregon Short Line R. Co., 60 Idaho 267, 90 P.2d 707. This disposition of the vitals of the case obviates the necessity of considering other errors urged by appellants, since the non-suit should have been granted. Morris v. Chicago, M., St. P. & P. R. Co., 1 Wash.2d 587, 97 P.2d 119.

The judgment is sustained. Costs to respondents.

PORTER, TAYLOR, THOMAS, and KEETON, JJ., concur.