[S. F. No. 14240. In Bank.—July 25, 1931.]

CLYDE S. CATE, as Administrator, etc., Respondent, v. FRESNO TRACTION COMPANY (a Corporation) et al., Appellants.

Conley, Conley & Conley, Everts, Ewing, Wild & Everts, Dan F. Conway and L. N. Barber for Appellants.

George R. Lovejoy and Ray W. Hays for Respondent.

CURTIS, J.—The facts in this case are correctly stated by the District Court of Appeal (295 Pac. 98) and are as follows:

"This is an action brought by Clyde E. Cate, as administrator of the estate of Genevieve Brennan, deceased, against the Fresno Traction Company and its motorman, W. E. Gash, and also against William H. Bruce, the driver of the automobile in which Genevieve Brennan, deceased, and her minor son were riding at the time of the collision, which occurred at a railroad crossing on September 20, 1928. The case was tried before a jury and resulted in a verdict against all of the defendants for $20,001; also a judgment of nonsuit in favor of the Fresno Traction Company and W. E. Gash as against the cross-complainant on the cross-complaint of William H. Bruce. All of the defendants have appealed.

"The Fresno Traction Company operates its electric trolley line on regular schedule between the city of Fresno and the town of Pinedale, which is situated some nine miles north of

Fresno, and has been operating such line for a number of years. The line runs approximately north and south between Fresno and Pinedale and is a single track line where it crosses Shaw avenue, which is a paved highway and runs approximately east and west. The paved portion of the highway is twenty-four feet in width and crosses the tracks of the Fresno Traction Company at a right angle. This intersection is about five miles from the city of Fresno in a level and sparsely settled country.

"The deceased, Genevieve Brennan, a woman of thirty-five years of age at the time of the accident, was employed by defendant William H. Bruce, a man of thirty-seven years of age, to do general housework on a ranch upon which he was living and was leasing, which is located about eleven miles north of Madera. Some two weeks prior to the accident Bruce had taken Mrs. Brennan and her small boy to visit her mother and on the date of the accident had gone for them and was returning them to his ranch. Bruce drove his automobile in a westerly direction along Shaw avenue. The trolley car involved in the collision approached Shaw avenue from Bruce's right and was traveling in a southerly direction towards Fresno. For 637 feet along Shaw avenue before reaching the car tracks and on Bruce's right as he approached the crossing and in the direction from which the electric car was approaching there was nothing to obscure Bruce's nor Mrs. Brennan's vision of the electric car; the ground was level, no foliage, house or other obstructions of any kind were in the open country on their right as they proceeded towards the rails of the Fresno Traction Company. Three hundred and seventy feet from the tracks facing east and in the direction from which Bruce and the deceased approached the tracks was a standard California State Automobile Association railroad sign. The property lines extend eighteen feet both north and south of the paved portion of Shaw avenue. Twelve feet six inches from the rail and facing the direction from which the automobile was approaching and thirteen feet north of the paved portion of the highway stood a standard railroad crossing sign. The automobile in which Bruce, Mrs. Brennan and the child were riding was an open Ford. Mrs. Brennan sat next to Bruce in the front seat, and the boy was sitting at the right of his mother. From defendant Bruce's testimony it appears

that he and Mrs. Brennan were discussing what he had done while she had been away and a dance he attended. As they approached the tracks and at a distance of about sixty or eighty feet therefrom they both looked to the right and then he looked to the left. He further testified that he saw nothing; that Mrs. Brennan said nothing until just before the crash when she said 'Lord! There is a car'; that he did not slow the speed of his automobile at any time during his approach to or while he was upon the tracks. As to the motorman giving a warning signal, there is some conflict. Both the motorman and Robert Morris Hogan—the only passenger on the electric car at the time of the accident— testified that the motorman sounded a warning gong, the motorman stating: 'Somewhere within about sixty feet of the edge of the paved portion of the highway, and I rang my gong . . . and he didn't check his speed any, and they were looking right at me, and I thought he was going on through, or he might have been aiming to stop; I can't say that he didn't check his speed . . . I went over and got a little air. Taken just enough air through my air valve to pull the car down so it would give him plenty of time for clearance on through. . . . Well, he didn't check his speed. I got up within—something about ten or twelve feet of the edge of the paved portion of the highway and he was anywhere from about seven to nine feet east of the street car rail and all of a sudden he slammed on his brakes and swayed just a little to the left, and I had taken all the air I had, then at that time, and I realized there was going to be an accident.' The passenger Hogan stated that the motorman rang his gong 'ten or fifteen feet before we hit the crossing. I couldn't say just exactly how far'. Defendant Bruce testified that he heard no such gong sounded, and Floyd Lowden, a youth of thirteen years of age who was walking along Shaw avenue and whose attention, when he was about one hundred feet west of the car tracks, was attracted by the crash of the collision, testified that he did not hear a gong or bell ring. When the motorman first observed the automobile the electric car was traveling at eighteen or nineteen miles an hour, and when it approached the crossing it had been slowed down to seventeen miles per hour. The speed of the automobile according to defendant ·Bruce was from eighteen to twenty-two miles an hour. The automobile was

struck about the center of the highway, shoved along and across the same and up to a telephone pole which stood eighteen feet south of the southerly edge of the paved portion of the highway and a few feet west of the electric car tracks. Mrs. Brennan and her son sustained injuries from which they both died the next day.''

We will first dispose of the appeal of the defendant Bruce, the driver of the automobile in which plaintiff's intestate was riding at the time of her injury. He contends that the evidence is insufficient to support the verdict of the jury finding him guilty of negligence in the operation of his car at the time of and just previous to its collision with the street-car of his co-defendant, the Fresno Traction Company. We are unable to see upon what theory this appellant can make such a contention with any reasonable hope or assurance that it will be sustained. The appellant Bruce drove upon the street-car tracks either without looking to see whether a car was approaching thereon or, if he did look, with the car in plain view and approaching the highway at a rate of speed which would cause it in all reasonable probability to collide with his automobile as soon as the two reached the crossing. In either event he would be guilty of gross negligence. If he approached the railway tracks without either looking or listening for an approaching car he was, under the circumstances appearing in the evidence, guilty of negligence. There was a standard California State Automobile Association railroad warning sign on Shaw Avenue 370 feet from the crossing which Bruce could have seen before he reached the crossing had he used reasonable care. The railway tracks were themselves in plain view of motorists using the highway at this point, and there is evidence that Bruce was familiar with the highway and knew of the presence of the traction company's line of railway at this crossing. It is manifest that Bruce was guilty of negligence if he drove his machine upon the track of the defendant corporation without first looking to see whether he could cross said track with safety. If Bruce looked for an approaching train, and his testimony is that he did, he must have seen it as it could not have been more than 100 feet from the crossing at the time and there was nothing to obscure his vision for a quarter of a mile up the track from the crossing. ''The law presumes that a person possessing normal faculties

of sight and hearing must have seen and heard that which was within the range of his sight and hearing.'' (*Young* v. *Southern Pac. Co.*, 189 Cal. 746, 754 [210 Pac. 259, 262].) Therefore, if he looked for a car he must have seen it, and in deliberately driving his machine upon the car track with the car approaching, Bruce was guilty of negligence of the most extreme character. We, of course, do not know just which one of these two views of the evidence the jury accepted. As we read the evidence it seems plain to us that Bruce was so much engrossed in his conversation with the deceased that he did not look to see whether the crossing was clear before attempting to pass over it, and that without taking any of the reasonable precautions which the law enjoins upon one approaching a railroad crossing, he deliberately drove his machine almost upon the tracks before he observed the street-car approaching the crossing. It was then too late for Bruce to stop his machine, and although he set his brakes and turned to the left he was unable to avoid a collision with the street-car. Under no construction of the evidence can it be held to be insufficient to support the verdict of the jury against the appellant Bruce.

We will now turn to the consideration of the appeal by the Fresno Traction Company and its motorman, W. E. Gash. These appellants first make the contention that the evidence fails to show that Gash, the motorman, was negligent in the operation of the car which collided with Bruce's machine, resulting in the death of the deceased and her minor child. The testimony of the motorman as to his actions immediately prior to the collision is at best somewhat equivocal. He testified that he saw the machine in which Bruce and the deceased were riding when the car of the traction company was from 175 to 200 feet from the crossing and that at that time the automobile was possibly a little further from the crossing than was the street-car. The train was traveling about 18 to 19 miles per hour, and the automobile a little faster, possibly 25 miles per hour. Gash testified that at this time he did not pay ''much attention to him until I come on up. I was somewhere about 135 to 140 feet, and I threw off my power and was coasting up to the highway.'' ''Q. Where was he; what was he doing? A. He was still coming on up, all the time. Q. Did he change his speed any? A. Not any at all. . . . Q. You

threw off your power—? A. And coasted up. Q. Did you put on any air at that time? A. Not at that time, I didn't. Q. What next took place? A. Well, I got up within about —somewhere within about 60 feet of the edge of the paved portion of the highway, and I rang my gong—I always rang there, it is a crossing—and he didn't check his speed any, and they were looking right at me, and I thought that he was going on through, or he might have been aiming to stop; I can't say, but he didn't check his speed. . . . Q. Then when [what] did you do? A. I went over and got a little air. Q. Please explain what you mean by that? A. Taken just enough air through my air valve to pull the car down so it would give him plenty of time for clearance going on through. Q. That was about 60 feet away from the roadway? A. From the north edge of the paved portion of the highway. Q. Then what happened? A. Well, he didn't check his speed. I got up within something about ten or twelve feet of the edge of the paved portion of the highway and he was anywhere from about seven to nine feet east of the street car rail and all of a sudden be slammed on his brakes and swayed just a little to the left, and I taken all the air I had, then, at that time, and I realized there was going to be an accident. Q. Did you give it all the air you had? A. I gave it all the air I had. . . . Q. Then you came into collision. Describe the collision; how it happened. A. Well, he passed out in front of me and I caught him just behind the fender of the car and drug him just across the edge of the highway against this line post. . . . One of the poles of the street car line. . . . "

From this testimony of the motorman it is clear that he saw Bruce and the deceased in an automobile approaching the track of the car line and that he thought the driver in the automobile intended to pass over the crossing in front of the street-car. He accordingly slackened the speed of the car, intending to give time for the automobile to pass in front of the street-car. When at a point 60 feet from the edge of the paved highway he rang his gong, at the same time he noticed that the speed of the automobile was unchecked. It might be well here to note the contradiction in the evidence of the motorman regarding the ringing of the gong at this point. Bruce testified that he heard no gong and the passenger in the street-car, Hogan, testified that the

motorman rang his gong "ten or fifteen feet before we hit the crossing". The jury may well have accepted the testimony of Hogan and believed that the gong was not sounded by the motorman until the street-car was from ten to fifteen feet from the highway. Hogan's testimony finds some corroboration in the evidence given by the motorman when he testified that "at the time I gave all the air I had, I was about 10 or 12 feet from the edge of the highway" and that when the street-car was about ten or twelve feet from the edge of the highway Bruce slammed on his brakes and turned his machine to the left. It would be a natural thing for the motorman to do when he gave his car "all the air he had", in an endeavor to stop his car, that he would also sound his gong to warn Bruce of the presence of the street-car. Evidently it was at this point when the street-car was somewhere from ten to twelve to fifteen feet from the north edge of the highway that the motorman first realized that there was liable to be a collision between his car and the automobile. It was at this time that Bruce apparently first had knowledge of the street-car. Whether we are correct or not in this conclusion, there is ample evidence in the record to support the conclusion that when the motorman saw the automobile approaching the street-car track he was of the opinion that the driver of the automobile intended to cross in front of the street-car. He accordingly lessened the speed of his car in order to permit the automobile to pass. In doing so, however, he did not attempt to stop his car or to reduce its speed to a rate which would permit the automobile to make the crossing in safety, but, on the other hand, he allowed his car to travel at such a rate of speed that it collided with the automobile at the crossing. He discovered his mistake when he was only a few feet from the highway and then to use his language, "gave it all the air I had" in an endeavor to avert the collision. It was then impossible for him to stop his car before it collided with the automobile. We think this evidence establishes a clear case of negligence against the motorman in the operation of his car, which negligence being that of an employee is imputed to his employer, the Fresno Traction Company.

These appellants contend, however, that the motorman had the right to assume that Bruce would stop his automobile or turn to one side before crossing the track, and thus

avoid a collision with the street-car. The law on this subject seems to be correctly stated in the cases of *Arnold* v. *San Francisco-Oakland T. Rys.*, 175 Cal. 1 [164 Pac. 798, 800], and *Billig* v. *Southern Pac. Co.*, 192 Cal. 357 [219 Pac. 992, 995]. In the first of these cases we find the statement that, "He [the motorman] had the right to presume that Arnold [the driver of the automobile] would stop or turn aside, until the conduct of Arnold was such as should reasonably have led him to apprehend the contrary." In the second case cited the court stated the rule as follows: "The operator of such a train or car was not bound to check the otherwise rightful speed of his train or car in approaching and passing such crossing until at least he has reason to believe that such person so approaching such crossing is not performing, or is not likely to perform, his duty in the foregoing regard."

Undoubtedly in the present case the motorman had the right to presume that Bruce would perform his duty and would either stop or turn aside until the conduct of Bruce led him to apprehend the contrary. From the motorman's own testimony it clearly appears that the conduct of Bruce, when the street-car was 135 to 140 feet north of the crossing, was such as to lead the motorman to believe that Bruce was intending to cross in front of the train. He did not assume that Bruce would stop, but, on the other hand, he assumed that Bruce did not intend to stop, and he, the motorman, attempted to regulate the speed of his car in order to permit the automobile to pass over the crossing ahead of the car. The two cases above cited cannot be held applicable to the facts of this case. On the other hand, the facts of this case bring it more nearly within the rule enunciated in *Stein* v. *United Railroads*, 159 Cal. 368, 378 [113 Pac. 663, 667]. In that case the court said: "The evidence then being sufficient to show that the motorman had reason to believe that the plaintiff was likely to be injured, the law imposed upon him the duty of exercising at least ordinary care to avoid the injury. It is clear that within the contemplation of ordinary care and prudence and in consonance with a just regard for the safety and welfare of others, the act required of him was to endeavor to stop his car before a collision occurred. At least, the case was such as to make it a proper question to be deter-

mined by the jury whether he acted promptly in his effort to stop the car when he was apprised of plaintiff's danger. If he made an honest effort to do so, no one, of course, could contend that he was at fault. But, on the other hand, if he failed to use the means at hand and made no effort to prevent the accident until he saw that it was impossible to avert it, the jury would be justified in finding for the plaintiff.''

■ Here the evidence shows that the motorman when sixty feet from the crossing was firmly of the opinion that Bruce did not intend to stop before crossing over the street-car track. He had it in his power to resort to his air-brakes to stop his car and thus prevent the collision. Instead of doing so he waited until he was between ten or fifteen feet from the crossing when, for the first time, he made a real attempt to stop his car. It was then too late. Notwithstanding the brakes, the car proceeded across the highway and collided with the automobile just as it reached the car track. The act of the motorman in failing to stop his car cannot under this evidence be justified or excused by resort to the rule that he had the right to assume that Bruce would stop his machine before crossing the street-car track, as by his own testimony he admits that the conduct of Bruce clearly indicated to him that Bruce did not intend to stop or turn aside before reaching the street-car track. We have referred to the testimony of the motorman as equivocal due to the fact that while he testified as above set forth that he thought Bruce intended to pass in front of the approaching street-car and that he, the motorman, attempted to regulate the speed of his car so as to permit him to do so, in other parts of his testimony he states, in one place that he did not know whether Bruce intended to stop or not before reaching the street-car track, and in still another place he says he thought Bruce intended to stop before passing over the crossing. The jury had the right to accept any one of these conflicting statements as true in passing upon the conduct of the motorman. Evidently they believed that portion of his testimony in which he stated that he thought from Bruce's actions that Bruce intended to pass in front of the street-car.

■ It is next contended that the deceased, Genevieve Brennan, was herself guilty of contributory negligence which

was the proximate cause of her injury and, therefore, the plaintiff as her administrator cannot recover. It is not claimed that the deceased was guilty of any overt act which contributed to her injury but on the other hand, the contention is that she failed to exercise due care for her own safety in not observing the street-car before she did and warning Bruce that it was approaching the crossing. It is conceded that the negligence of a driver of a vehicle cannot be imputed to a passenger. It is also we think conceded that contributory negligence is a question for the jury. If there is any question as to the correctness of either of these two statements we would cite in support of them the following cases: *Bryant* v. *Pacific Elec. R. Co.*, 174 Cal. 737 [164 Pac. 385], *Irwin* v. *Golden State Auto Tour Corp.*, 178 Cal. 10 [171 Pac. 1059], *Nichols* v. *Pacific Elec. R. Co.*, 178 Cal. 630 [174 Pac. 319], and *Marchetti* v. *Southern Pac. Co.*, 204 Cal. 679 [269 Pac. 529]. We must construe the evidence, therefore, bearing upon the issue of contributory negligence of the deceased in the light most favorable to the plaintiff. The evidence shows, we think, without any question that Mrs. Brennan, the deceased, had absolutely no control of the machine in which she was riding and that she occupied the position of a guest therein, pure and simple. She was an employee of Bruce and was being taken by him from the home of her mother to the home of Bruce, where she acted as the latter's housekeeper. The deceased assumed no responsibility in the operation of the machine and under the facts in this case the law cast upon her no responsibility. There was no evidence that Bruce up to the time of the collision was not properly and carefully operating his machine. Deceased, therefore, had no reason to be apprehensive of her safety while riding with him or to take any unusual precaution against their running into danger. The most that can be said as to her responsibility in this regard is that if she observed anything which might tend to endanger her safety, it was her duty to notify the driver of this danger in order that he might avoid it. Ordinary prudence for her own safety would require this. If she saw the street-car approaching the crossing in front of them, it was undoubtedly her duty to notify Bruce if she had reason to believe that he did not also see the car and might collide with it at the crossing at the rate of speed at which they

were traveling. The evidence as to whether she saw the street-car before it entered the crossing may be said to be conflicting. The motorman said that she and Bruce were looking straight at the street-car long before it reached the crossing. As we have said regarding the claim that Bruce saw the street-car when it was some distance from the crossing, we think on the whole it favors the view that he did not see it or know of its being on the track until just before the collision. The evidence we think is much stronger in favor of the conclusion that Mrs. Brennan was not aware of the presence of the street-car until just before their machine collided with it. Her exclamation, evidently spontaneously uttered just before the crash, "Lord! There is a car!" indicates her complete surprise on seeing the street-car in front of them. Had she seen it a few minutes or seconds previously, as might be inferred from the testimony of the motorman, we would not expect such an exclamation from her. The jury, we think, could well have believed from the testimony in the case that Mrs. Brennan was wholly oblivious to the fact that the street-car was approaching the crossing until the moment she uttered the above exclamation. They were, therefore, justified in finding that she was not guilty of contributory negligence in failing to warn Bruce of its presence. For a discussion of the responsibility of a person while riding as a guest in a vehicle driven by another, we would refer to the following cases decided by this court: *Parker* v. *Southern Pac. Co.*, 204 Cal. 609 [269 Pac. 622]; *Marchetti* v. *Southern Pac. Co.*, 204 Cal. 679 [269 Pac. 529]; *Martinelli* v. *Poley*, 210 Cal. 450 [292 Pac. 451].

Appellants rely with considerable strenuousness upon the case of *Barnett* v. *Atchison etc. R. Co.*, 99 Cal. App. 310 [278 Pac. 443], in support of their contention that the evidence in the present action establishes beyond conflict that the deceased although riding in the automobile as a guest was guilty of contributory negligence. We had reason to refer to that case in our decision in *Smellie* v. *Southern Pac. Co.*, 212 Cal. 540 [299 Pac. 529, 539]. We there held that it had no application to the facts in the Smellie case, in which case damages were asked for the death of plaintiff's husband, who was riding as a guest at the time of his injury. We referred to the fact that in the Barnett case, "No mention of the rule applicable to guests is to be found in

that entire case." No point was made in the Barnett case that any of the parties riding in the ill-fated machine were the guests of the driver, or of any other person. It cannot, therefore, in any sense be regarded as an authority upon the question before us. The contention that there is no evidence to support the implied finding of the jury that the deceased was not guilty of contributory negligence is accordingly not sustained.

A third contention made by appellants is that the court erred in submitting to the jury special findings. The deceased, Genevieve Brennan, left as her heirs at law a husband, from whom she had been separated for some time immediately preceding her death, and four minor children. The children were dependent upon their mother for support. The court, after instructing the jury as to the law applicable to the general facts of the case, gave the following instruction: "In the event you find for the plaintiff, you will fix the amount of damages in one lump sum in accordance with the instructions I have given you and that, of course, would be inserted in the verdict which you brought in. Now, in addition to that, after that is done, in the event you should find a verdict for the plaintiff, and after you have fixed the damages in one lump sum, then at the request of the plaintiff I am asking you to bring some special findings on special issues which have been requested by the plaintiff." It then submitted to the jury five special findings by which it permitted the jury to find specially the amount each particular heir was entitled to receive from the total damage found. In response to those special findings submitted the jury found that the husband by the death of the deceased had sustained a pecuniary loss of one dollar, and that each of her four minor children had sustained a pecuniary loss of $5,000. A verdict in this form, while criticised, was upheld by this court in the case of *Robinson* v. *Western States Gas etc. Co.*, 184 Cal. 401 [194 Pac. 39, 43]. The court there said: "The defendant has no interest in the division which the plaintiffs may make among themselves, or which may be made for them, of the damages recovered. The statute contemplates a single recovery for the benefit of the family of the deceased or those of his heirs who are dependent upon him for support. Whether it is divided among them after recovery or not, or how it is divided, are

matters of no concern to the defendant." In view of this prior holding of the court, the action of the trial court in submitting these special findings to the jury cannot be held to be reversible error.

■ Finally the appellant, Fresno Traction Company, assigns as error the action of the court in refusing to give certain instructions requested by it and designated instructions Nos. 1, 2, 3 and 4. As to instructions Nos. 1, 2 and 3, it is apparent that they are directed to the question of Bruce's negligence in failing to exercise proper care in the operation of his automobile just prior to and at the time of the collision. We fail to see how the refusal of the court to give these instructions could affect the case of the plaintiff inasmuch as the negligence of Bruce was not imputable to the deceased. Instruction No. 4, while directed to the question of negligence on the part of the deceased, was fully covered by other instructions. It was not error, therefore, to refuse to give it.

We are satisfied after a consideration of the entire evidence in this case that it is ample to justify the verdict of the jury finding that the death of the deceased was proximately caused by the concurrent negligence of the driver of the automobile and the motorman.

The judgment is, therefore, affirmed.

Preston, J., Waste, C. J., Shenk, J., and Seawell, J., concurred.

Rehearing denied.