427 P.2d 568

Marion D. CHARD and Ola M. Chard, husband and wife, Plaintiffs-Respondents,

v.

W. C. BOWEN, Defendant-Appellant.

No. 9821.

Supreme Court of Idaho.

April 24, 1967.

Coughlan & Imhoff, Boise, for appellant.

Gigray, Boyd & Downen, Caldwell, for respondents.

TAYLOR, Chief Justice.

About 8:00 a. m. on January 30, 1964, plaintiff (respondent) Ola Mae Chard was driving her car west on highway 20 on her way to Caldwell where she was employed as a cook at the Elk's Club. It was a cold morning; the road was icy and slick and visibility was limited by fog to about "a city block" (plaintiff's testimony). As she proceeded at a rate of about 25 to 30 miles per hour, she came up behind a school bus which was stopped, partially blocking the westbound lane of the two-

lane highway. There were two other automobiles, also stopped, between plaintiff and the bus.

Plaintiff testified that bright taillights on the bus were clearly visible; that the bus was stopped for about five minutes while children came from a nearby farmhouse and went on board; that the bus pulled back onto the road; that the other vehicles had just left the scene; and that she was just about to start her car moving when it was struck from the rear by a pickup driven by defendant (appellant) Bowen.

Defendant Bowen testified that he was driving from Boise to Caldwell; that the weather was foggy; the road was slick; that he could see only 15 feet ahead of him when the accident occurred; that he had not been going over 20 miles per hour during the whole trip; that he slowed down to about six or seven miles per hour when a car passed him; that about 25 to 30 feet farther along he suddenly saw the taillights on plaintiff's car, and of one other car ahead of her; that he did not see the bus nor the other of the two cars ahead of plaintiff; and that when he saw plaintiff's taillights:

"I pumped the brakes lightly, it was awful slick, pumped the brakes lightly and I was getting closer all the time, that is, to the car, and the brakes just locked and slid, you know what I mean, they just slid, I slid under it."

Defendant also testified that the impact was not severe; that it drove plaintiff's car about five or six feet forward.

Plaintiff testified that damage to her car was such that to repair it required a new gas tank, straightening of the rear cross-member, rear bumper and deck; that the wraparound windshield was cracked in two places near the steering wheel; that the left door of the two-door car was jambed so that it required alignment. As to her injury, the impact "doubled me back over my seat" and:

"For a minute I think I was blacked out because when I went back something struck me funny, I could not think for

a minute what had happened, and when I came to, why, or got straightened up again why of course I grabbed to open up my door and I couldn't open my door, it wouldn't open, I bumped it with my knee, and if I remember right, I bumped it three times before it opened."

Plaintiff further testified that prior to the accident she had been in good health and suffered no aches or pains in her back or neck; that after the accident she had been in such pain that she often needed painkillers; and for six months she needed medication in order to sleep. Asked about her sensations of pain while at work during the week following the accident, she answered:

"Well, I was really sore from the impact, not only in my neck but through my shoulders and all through my back, of course, as time went on it settled more or less in the upper part of my neck and it really hurt, as far as lifting, I was no good at lifting, I couldn't— my arms wouldn't lift, that is all, I had to have somebody lift—do all the lifting."

She further testified that her condition had improved at the time of trial, but was still often painful; that the pain occurred from her neck down about eight inches of the spinal column and in her arms above the elbow. Her testimony as to her physical condition was corroborated by her husband, who also testified that at the time of trial it was still necessary for her to take painkillers.

Two expert witnesses were called by the plaintiffs: Dr. Lyle Stone, an internist, and Dr. Jerome K. Burton, an orthopedic surgeon. One expert, Dr. Manley Shaw, an orthopedic surgeon, was called by defendant.

Dr. Stone, who examined plaintiff the day after the accident, testified:

"The trapezius, the muscles to the right of the spine—the neck were in extreme spasm, the head was deviated to that side because of the tightness of the muscles in this group, there was attempts to turn her head or rotate her head from one side to the other showed extreme

limitation of her ability to permit this, particularly the rotation of the head to the right, flexional movements were limited and extension movements were severely limited."

He likened the muscular spasm to a "charlie-horse" in which the tightening of the muscle becomes so severe as to be almost intolerable.

"Q Now then, these ligaments and tendons, what happens to them when you—if you have got a quick bending of the neck and sudden forceful and unusual action?

"A There is tearing.

"Q Tearing. What do you mean by tearing?

"A Tearing much as you would tear a band holding a carton apart.

"Q You have tearing then?

"A Breaking asunder of fibers.

"Q If you have a tearing of the ligaments of the spinal column, what happens when you tear flesh or tear muscles?

"A There is bleeding, the immediate result, there is severe pain and muscle spasm, the late result is limitation of motion, scarring, fixation, permanent pain and even encroachment upon the little holes through which these nerves come."

"Q * * * And from your diagnosis of her what did you conclude happened to the ligaments and tendons of her cervical spine.

"A I concluded that she had quite considerable tearing of ligaments, I based this on the finding of muscle spasms so severe I was unable to turn the head in either direction, I was unable to bend the head backward, I was unable to bend the head forward, in fact, I was unable to straighten the head, the muscles on one side were with spasms sufficiently severe as to deviate the head over to one side, I—it was not even possible to straighten her head."

Dr. Stone also testified that the tearing of the tissues along the spine had been sufficient that the resultant bleeding caused ecchymosis—that is, some of the blood filtered out to the surface and caused black or dark areas; that when the tissues so torn, healed, scarring resulted, causing contraction on nerve roots, resulting in limitation of motion and recurrent pain; that when plaintiff came to him the day after the accident, pain and muscular spasm were so severe that X-rays could not be taken; that X-rays taken January 31, 1964, revealed that at the time of the accident plaintiff's spine had an abnormal amount of osteoarthritis; that the large spine on the sixth vertebra had,

"been fractured away or separated away from the body of the sixth vertebra, there would be then, reason to suspect that the acute injury had something to do with the separation of that spine, otherwise I have been unable to identify any new injury to bony structure, we would therefore conclude that the injury producing the patient's physical findings was due to soft tissue injury plus a fracture of an osteophyte from one particlar body."

As to treatment, the doctor testified:

"We frequently injected her and had great difficulty managing her pain for six weeks. Subsequently we continued to have difficulty but the pain apparently has been at a level that she has tolerated better."

As to her condition at the time of trial the doctor testified:

"The present situation is that she has a neck which she complains of being constantly painful, she has intermittent bouts of muscle spasm, she is unable to accomplish, as she states, some of the things involved in her work as a cook which she was formerly able to do in the way of having to have someone aid her in particular movements, she has to be careful about the amount—the number of degrees in which she inclines her head least she bring on a painful bout of muscle spasm."

As to the future, the doctor testified that the injury had aggravated and would continue to aggravate plaintiff's arthritic condition, and would result in more rapid development of that condition and acceleration of the resultant limitation upon her ability to work.

Dr. Burton testified that when plaintiff first visited him October 12, 1964:

"She was acutely tender, particularly in the suboccipital region, which is the region right behind the base of the skull, and there was considerable muscle spasm. Muscle spasm is a natural protective mechanism that nature uses on her own, whenever you have a painful area, nature will have the muscle as we say go into spasm but what they actually do is tighten up to spread (sic) the motion of the painful joint and this is what I found in the area right under the skull, not only there but in the other muscles of the neck and she was unable to accomplish the normal range of motion because of both muscle spasm and the pain associated with movement of the neck.

"Q Now, doctor, how much limitation of movement did Ola Chard have in her neck as you recall when you examined her the first time in October?

"A At that time I would say she had between 80 and 90 percent of restriction of motion, this was October of 1964."

Dr. Burton also testified that in his opinion the fracture of the vertebra spine shown by the X-rays resulted from the accident; that the injury sustained would increase the progress of the osteoarthritis; and had increased the loss of mobility from the 10 to 30 percent normal for one with plaintiff's arthritic condition to the 80 to 90 percent which he found to exist.

Dr. Manley Shaw, who examined plaintiff November 12, 1964, testified:

"I felt she had an osteoarthritis of her cervical spine which—with a superimposed sprain type of injury to the neck from the history and some bicepital tendonitis of her left shoulder, this may or may not be related to the injury since the symptoms began only a short time, apparently, before my examination.

"Q The extent of whatever this condition was, the tendonitis.

"A This again, is a degenerative process that you see commonly in middle age and beyond where the tendon gradually frays and gets a little irregularity and then will catch as it glides through the groove or tunnel.

"Q What would you say as far as Mrs. Chard is concerned with respect to its severity, or lack of severity?

"A She did not demonstrate any actual limitation of motion although she apparently had a little twinge of pain as she raised and attempted to put her hand behind her head."

Dr. Shaw also testified that the X-rays showed little or no evidence of the claimed injury of January 30th; and even if such injury occurred it would not necessarily aggravate the preexisting osteoarthritis.

Plaintiffs brought this action to recover damages for injury sustained by Mrs. Chard, alleged to have been caused by negligence on the part of defendant Bowen. Upon trial the jury returned a verdict in favor of plaintiffs for $7500. Bowen brought this appeal from the judgment entered thereon, and from the order denying his motion for a new trial.

One of the grounds urged for a new trial was that the verdict was excessive. We have set out sufficient testimony from the record to show that the amount of the verdict was supported by substantial evidence, and is therefore conclusive of this issue. I.C. § 13–219.

Defendant urges error in the denial of his motion for a mistrial. The motion was made during the examination of Mrs. Chard by her own counsel. The witness was being questioned as to events following the accident after the arrival of the sheriff:

"Q What did you and the sheriff and Mr. Bowen do then at Lakey's?

"A Exchanged addresses, phone numbers, insurance names.

"Q And he filled out the accident report?

"A That is right.

"Q All right, now—

"MR. COUGHLAN: Just a moment, Your Honor, I would like to make at this point a motion outside the hearing of the jury."

Then after the jury had retired:

"MR. COUGHLAN: If Your Honor please, at this time comes now the defendant and moves this court for a mistrial upon the ground that the plaintiff has interjected insurance into the case voluntarily, all of which is prejudicial to the defendant in this matter."

Defendant also urged his motion on the ground that on voir dire examination of the jurors improper reference to insurance had been made by plaintiffs' counsel. The voir dire examination is not in the record and for that reason cannot be examined or further considered here.

When the jurors had returned, the court orally instructed them to disregard the reference, by the witness, to insurance, and that consideration of the subject by them would be a violation of their oath. In submitting the cause to the jury the court in its written charge further instructed:

"You are reminded that no insurance company is a party to this action and that whether either party is insured has no bearing whatsoever on any issue that you must decide. Therefore, the oath you took as jurors requires that you refrain from any inference, speculation or discussion about insurance."

Defendant urges that the amount of the verdict supports his contention that he was prejudiced by the reference to insurance. As we have indicated, the record does not show that the verdict was excessive.

■ The motion for mistrial invoked the discretion of the trial court. No abuse of that discretion is shown in this case. Barry v. Arrow Transportation Company, 83 Idaho 41, 358 P.2d 1041 (1960); Anno. 4 A.L.R.2d 761.

Defendant contends that the act of plaintiff Mrs. Chard in stopping her car on the paved or traveled part of the highway was negligence per se. This contention is based upon the alleged violation of I.C. § 49-755, which reads:

"(a) Upon any highway outside of a business or residence district, no person shall stop, park, or leave standing any vehicle, whether attended or unattended, upon the paved or main-traveled part of the highway when it is practical to stop, park, or so leave such vehicle off such part of said highway, but in every event an unobstructed width of the highway opposite a standing vehicle shall be left for the free passage of other vehicles and a clear view of such stopped vehicles shall be available from a distance of 200 feet in each direction upon such highway.

"(b) This section shall not apply to the driver of any vehicle which is disabled while on the paved or main-traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such disabled vehicle in such position."

■ Admittedly plaintiff's car was not disabled, and the evidence showed that the shoulders were sufficiently wide and of such gradual slope that plaintiff could have driven her car off the traveled roadway. Also, there was a driveway leading to a residence on the north of the highway which plaintiff could have used to park her car off the traveled way. This evidence, in defendant's view, shows that it was "practical" for plaintiff to stop or park off the traveled part of the highway, and therefore her failure to do so was a violation of the statute, and negligent. The statute is in terms mandatory. Hence, an unexcused violation thereof is negligence per se. Bale v. Perryman, 85 Idaho 435, 380 P.2d 501 (1963); Howard v. Missman, 81 Idaho 82, 337 P.2d 592 (1959); State ex rel. McKinney v. Richardson, 76 Idaho 9, 277 P.2d 272 (1954); Ineas v. Union Pacific R. Co., 72 Idaho 390, 241 P.2d 1178

(1952); Brixey v. Craig, 49 Idaho 319, 288 P. 152 (1930).

In State ex rel. McKinney v. Richardson, supra, we said:

"In some cases such a violation may be justifiable or excusable, but to be justified or excused the violation must arise out of circumstances beyond the control of the violator. The rule is stated in C.J.S., as follows:

" 'Prudence may sometimes require the doing of an act which would otherwise be in violation of law, and, even though an act or omission involves a violation of a statute or ordinance, liability may, in some cases, be avoided by showing that under the circumstances of the particular case the violation was justifiable or excusable; but the fact which will excuse a technical violation must result from causes or things beyond the control of the person charged with the violation.' 65 C.J.S., Negligence, § 19 h., p. 426." 76 Idaho at 14, 15, 277 P.2d at 274.

And in Bale v. Perryman, supra:

" * * * It must be recognized that certain circumstances furnish an excuse or justification for the negligence presumed to arise on proof of violation of a statute or ordinance. Such circumstances may generally be classified in four categories: (1) Anything that would make compliance with the statute impossible; (2) Anything over which the driver has no control which places his car in a position violative of the statute; (3) An emergency not of the driver's own making by reason of which he fails to obey the statute; (4) An excuse specifically provided by statute. (Florke v. Peterson, 245 Iowa 1031, 65 N.W.2d 372)." 85 Idaho at 443, 380 P.2d at 505.

In the following cases the courts have excused violations of statutes the same as, or similar to, our I.C. § 49–755, where the stop was occasioned by exigencies of traffic beyond the control of the driver: Lindsley v. Webb, 46 Wash.2d 189, 279 P.2d 639 (1955); General Ins. Co. of America v. Lewis, 121 Utah 440, 243 P.2d 433 (1952); McCoy v. Fleming, 153 Kan. 780, 113 P.2d 1074 (1941); Roddy v. American Smelting & Refining Co., 34 Cal.App.2d 457, 93 P.2d 841 (1939); Doss v. Rader, 187 Va. 231, 46 S.E.2d 434 (1948).

In McCoy v. Fleming, supra, the Kansas court said:

"Appellant argues that it was practical for plaintiff to have moved off the paved portion of the highway and on to the shoulder thereof, and that because he didn't do so he violated the statute. That argument ignores the latter part of the statute and the factual situation. The highway was blocked by the first collision which caused the succeeding traffic to stop. The record is silent as to the condition of the cars there involved but that their condition caused a stoppage in the flow of traffic is admitted. No one of the cars in that line of traffic may be said to have been stopped at the wish or desire of the driver, and that is what the statute denounces, but because conditions ahead compelled the stopping. Under the conditions existing, and in the exercise of ordinary care it was impossible for drivers of the cars in the line of traffic and for the plaintiff to avoid stopping. The fact plaintiff did not drive his car further to the right, or on the shoulder of the highway, did not make him guilty of violating the above statute." 113 P.2d at 1076.

In General Ins. Co. of America v. Lewis, supra, the Utah court said:

"This section [57–7–165, U.C.A. 1943] deals only with cases where the driver stops his car on the highway from his own choice and has an opportunity to select the place and conditions of his stop; it was not intended to regulate stopping forced by congested traffic on the highway where the driver wishes to proceed but cannot because of cars on the highway ahead of him." 243 P.2d at 434.

In this case the trial court charged the jury in the language of I.C. § 49–755(a); and in instructions 23 and 24 as follows:

"In determining whether it was practicable for a driver to stop or park his vehicle somewhere other than upon the paved or main-traveled part of the highway, you should consider not only the physical conditions bordering the roadway and what other places were available for stopping or parking but also the driver's reason for stopping."

"A violation of Idaho Code 49–755 that I have read to you, constitutes negligence as a matter of law, unless, under all the circumstances surrounding the event, the conduct in question was excusable or justifiable.

"To prove that a violation of a statute was excusable or justifiable so as to overcome the presumption of negligence, the evidence must support a finding that the violation resulted from causes or things that made compliance with the statute impossible, something over which the person charged with the violation had no control which placed his vehicle in a position violative of the statute, or an emergency not of such person's own making by reason of which he fails to obey the statute, and that the person who violated the statute did what might reasonably be expected of a person of ordinary prudence who desired to comply with the law, acting under similar circumstances."

■ The court also charged the jury pursuant to I.C. § 49–753(a) that it was the duty of drivers of motor vehicles approaching the stopped school bus, to stop and remain stopped until the stop arm on the bus was retracted.

These instructions fairly stated the applicable law and properly left to the jury the issue as to whether plaintiff was contributorily negligent.

■ Defendant assigns as error the refusal of the court to give his requested instruction on the doctrine of sudden emergency. Plaintiffs' complaint charged de-fendant with negligence (1) in failing to keep a proper lookout and (2) in failing to have his vehicle under proper control. These were acts of negligence alleged to have occurred prior to the time defendant saw plaintiff's taillights, i. e., prior to the arising of any emergency. Plaintiffs charge that it was *defendant's prior negligence* which give rise to the emergency. The doctrine requires, for its application, that the emergency was not one arising out of negligence on the part of the defendant. Hackworth v. Davis, 87 Idaho 98, 390 P.2d 422 (1964); Barry v. Arrow Transportation Co., 80 Idaho 447, 333 P.2d 1008 (1959); Stuart v. McVey, 59 Idaho 740, 87 P.2d 446 (1939). The jury's verdict against defendant presupposes a finding that the emergency which confronted him was of his own making. The instruction was not applicable. Hackworth v. Davis, supra.

Judgment affirmed.

Costs to respondents.

SMITH, McQUADE, McFADDEN and SPEAR, JJ., concur.